A. G. SCHEPPS, d/b/a Schepps Grocery Supply, Appellant,

v.

AMERICAN DISTRICT TELEGRAPH CO. OF TEXAS, Appellee.

No. 15008.

Court of Civil Appeals of Texas.

Dallas.

Dec. 16, 1955.

Rehearing Denied Jan. 13, 1956.

John W. Miller, and Turner, Rodgers, Winn, Scurlock & Terry, Dallas, for appellee.

YOUNG, Justice.

Plaintiff-appellant's tort action against appellee charging breach of an alleged contract to indemnify him against loss through burglary, was challenged by defendant in this summary proceedings, pursuant to Texas Rules of Civil Procedure, Rule 166–A, "Summary Judgment." Defendant's motion therefor was supported by affidavit of its Chief Clerk and oral depositions of plaintiff and his store manager, Julius Schepps; plaintiff making detailed but unsworn reply, and his second amended original petition is not verified. Upon hearing, judgment was rendered for American District Telegraph Company limiting plaintiff's recovery, following written contract recitals, to the sum of $50; the latter duly prosecuting this appeal.

On all material dates plaintiff was conducting a grocery store and market known as Schepps Grocery Supply. Under the basic contract of August 25, 1950, pled by him, he was one of appellee's subscribers, the instrument being styled "Central Station Burglary and Holdup Protection Service"; claiming, however, in lengthy pleading that the true contract between the parties was one of indemnity against loss by burglary, which provision was omitted from the writing through fraud of defendant's agent Fisher, committed prior to or at time of its execution. Contents of the 1950 contract must be outlined briefly. It recited that defendant as contractor would install on subscriber's premises equipment and wires connecting same to its Central Station for transmittal of electrical alarms; providing employees to investigate all signals of an irregular nature originating from described location, and in case of holdup alarms to notify the Police Department; subscriber agreeing to pay an installation fee of $350 and $403 per annum (monthly in advance) for a period of five years.

Material here are paragraphs 13, 16, and 17 of the written contract which was signed by plaintiff and D. M. Fisher, Company

Burt Barr and J. Lee Zumwalt, Dallas, for appellant.

Agent: "(13) It is agreed by and between the parties hereto: that the Contractor is not an insurer; that the payments hereinbefore named are based solely on the value of the services provided for herein; that, from the nature of the services to be rendered, it is impracticable and extremely difficult to fix the actual damages, if any, which may proximately result from a failure on the part of the Contractor to perform any of its obligations hereunder; that, in case of the failure of the Contractor to perform any of its obligations hereunder, and a resulting loss to the Subscriber, the Contractor's liability hereunder shall be limited to and fixed at a sum equal to ten percent of the annual service charge, hereinabove provided for, but in no event amounting to less than the sum of fifty dollars, as liquidated damages, and not as a penalty, and this liability shall be exclusive. * * * (16) This agreement is not binding unless approved in writing by an authorized representative of the Company described above as the Contractor. In the event of failure of approval, as aforesaid, the only liability of the Contractor shall be to return to the Subscriber the amount, if any, paid to the Contractor upon the signing of this agreement. (17) There are no verbal understandings changing or modifying any of the terms of this agreement. This agreement cancells and supersedes agreement dated 1–15–47."

On October 17, 1950 defendant sent to plaintiff an approved copy of the instrument by letter of that date; plaintiff alleging, by the way, that the contract had been executed in duplicate, he retaining a copy.

In the same connection plaintiff referred in second amended original petition to a supplemental contract of defendant, sent to him on February 22, 1952, to run concurrently with the earlier writing and covering certain additional services; alleging: "That in all other respects said supplemental agreement is on the printed form of the defendant as its contract of August 25, 1950, and it was likewise executed in duplicate, and the defendant has one copy, and the plaintiff one copy * * *"; and further: "That the defendant, on or about the 28th day of February, 1951, delivered to the plaintiff a certificate by the Underwriters' Laboratory Incorporated, certifying that the defendant had furnished a Grade A Central Station Burglar Alarm System to the plaintiff; * * *."

On the night of May 29, 1953 the store of plaintiff was burglarized, persons unknown making forcible entry into his steel safe, removing therefrom the sum of $25,-777.47 in money and appropriating same to their own use, to his damage in said amount; with demand made upon defendant for reimbursement and $5,000 attorneys' fees. This suit followed, plaintiff in his amended petition charging in substance that the prior contract of August 1950 was induced by certain material representations on part of defendant's agent, D. M. Fisher, upon which he relied to his injury; reflected in part by the following allegations: "That they would fully indemnify him for any and all losses that might occur by reason of the failure of the said system to operate, or the prevention of the burglary by them as above set out. That the amount charged for such service would be less than the charge made by an insurance company, that he would receive ample and full protection and indemnity at less cost than he could secure from an insurance company; * * * That said representations were made by said D. N. Fisher for the purpose of inducing the plaintiff to believe the same and rely thereon, and thereby induce him to make and enter into a contract with the defendant for the protection and indemnity of his property and damages thereto, and that this plaintiff did rely upon said representation and agreed to the defendant installing said system in his property and agreed to make the payments and receive the protection and indemnity from the defendant as represented by said Fisher. * * * Plaintiff further alleges that the representations made by the defendant by its agent, D. N. Fisher, on or about the 25th day of August, 1950, and at the time of the delivery of said written agreement of August 25, 1950, which were made on that date, he did not read said written contract, but was caused to believe, and did believe, that it was in accordance with the repre-

sentations of the said defendant's agent, D. N. Fisher, and that it would fully protect and indemnify him from any and all losses or damages which he might suffer by reason of burglary, theft, or other causes which said system was to protect him from. That he did not agree to any limitation of liability, and the limitations therein stated was placed therein without his knowledge or consent and was a fraud upon the part of the defendant, and should not be held binding on this plaintiff, but that the defendant under the agreement was at all times, and is now, liable to the plaintiff for any and all losses and damages suffered by him, especially as hereinafter stated."

In support of defendant's motion for summary judgment filed January 6, 1955, was the affidavit of Mrs. Wanda Phillips, its Chief Clerk, relating to the above mentioned Certificate of Underwriters' Laboratories, Inc., admittedly received by plaintiff February 28, 1951; and verifying defendant's letter written in such connection. This "Certificate," apparently issued for purpose of enabling plaintiff to secure lower insurance rates, is referred to in said letter, which reads:

"March 1, 1951

"Schepps Grocery Supply
"1301–03 South Harwood Street
"Dallas, Texas.
 "Underwriters' Laboratories
 "Certificate No. 607690
 "Grade A Complete, Merc. Vault
"Gentlemen:

"We attach Underwriters' Laboratories Certificate covering the burglar alarm system installed in your premises. We are authorized by the Underwriters' Laboratories to issue this certificate for the purpose of indicating to those interested the grade and extent of protection as defined by the Underwriters' Laboratories standards. The extent of protection of the equipment shown in this certificate is based upon our records of the system as installed, and in furnishing this certificate we specifically disclaim any responsibility or liability for any action taken by insurance underwriters or others in connection therewith, with the further understanding that the issuance of this certificate does not affect nor in any way change the terms of the contract under which we are operating burglar alarm service in your premises. Our action is taken for the convenience of. the laboratories and without obligation of any nature in connection therewith.

"Do not destroy or lose this certificate. It may be required by the insurance companies in order that you may receive full recognition for your protection. We suggest that it be permanently posted adjacent to the system instrument.

"This certificate becomes effective 2–29–51 and expires 11–17–55.
 "Very truly yours,
 "American District Telegraph Co.
 "C. G. Curry
 "Operating Superintendent."

Also a part of defendant's motion was the oral deposition of plaintiff A. G. Schepps and brother Julius, his store manager; and material here are excerpts of their testimony relative to the representations of Agent Fisher, made prior to execution of the service contract in question, dated August 25, 1950: "(Julius Schepps) Q. Now, what was it he said again? A. Because we had that new A. D. T. system in it and it would carry half price on the insurance if we decided to buy it. Q. Well, you could have gotten insurance at half price according to his statement? A. Yes, sir. * * * Well, he didn't recommend that you not take insurance, did he? A. No, sir."

(A. G. Schepps) "Q. When you decided to move to this present location from Cadiz Street what was done about the burglary alarm system? A. What do you mean, when I decided to move there on Cadiz? Off of Cadiz do you mean? * * * Q. From Cadiz Street? A. I build a new building from the ground up and also contracted with Mr. Fisher for A. D. T. protection. Q. Did you call him or did he call you about that protection? A. No, I called him because he wouldn't know I am building a building unless I would tell him.

Q. What did you tell him? A. I told him I wanted the same protection I had been having, and he told me he was going to give me better protection than I had. Q. All right. Then what did he tell you? A. Tell me what? Q. What did he tell you? A. He told me, I am going to have better protection than I ever had before; he is going to put in the same system the Federal Reserve Bank has got; no way in the world anybody can go in there without them knowing it. * * * Q. He didn't act like he was trying to crowd you or rush you— A. No. Q.—into signing the contract? A. No, No. * * * Q. Now, I have before me what purports to be a contract between you, A. G. Schepps, and the American District Telegraph Company, and also a letter dated October 17, which transmitted that contract to you after it had been approved by the higher ups of the A. D. T., and in which contract you look at the contract I have referred to and the letter and see if those are the documents that I have described? A. Yes. * * * Q. About how long did it take them to install the equipment at your present address, business address? A. I don't remember. Practically 30 days maybe. Q. During that time you don't recall whether you had this signed contract or not? A. According to this I signed that contract before I moved in the building, before it was finished. I didn't move in the building until December, 1950; December 1st, 1950. This was signed October 17. It must have been about 40 days before, or more, before I moved in there. Q. Now, have you told everything Mr. Fisher told you? A. I don't know anything else I care to talk about. Q. Well, you are not holding back anything here that you will testify to at the trial, are you? A. I wouldn't know. I don't know. Q. You allege in this petition that you were informed you wouldn't even have to carry insurance? A. Sir? That is right. That is right. I was under the impression I didn't need any. Q. *How did you get ahold of the impression? A. I didn't figure there was no way in the world anybody could get in without them knowing it, and they had three or four men out there, and they called the police department, with an alarm like he told me there was no me-*chanical failure.* (Emphasis ours.) Q. Then you got the impression from that that you wouldn't have to carry any insurance? A. That is right. My insurance man, Bill Susman, asked me a dozen times if I wasn't going to take it out on my cigarettes in that vault sometimes. * * * Q. *Are you charging that Mr. Fisher said, 'Sign this contract and you won't have to take out any insurance?' A. No, he didn't say that.* (Emphasis ours.) Q. In other words, you gained the impression that you would have protection sufficient enough to warrant you in not carrying any insurance? A. That is right. That is right. Q. Other than that nobody has represented anything to you about that? A. Just like I said before, we got the same as the Federal Reserve Bank, the same thing."

▇▇ Here should be noted the state of plaintiff's pleading on February 2, 1955, date of summary judgment. On the pretrial of July 1954, special exceptions of defendant had been leveled at the allegations of fraud made to plaintiff in inducement of the 1950 contract; also concerning the contractual limitation of liability as void and against public policy. These exceptions were sustained. However, despite said ruling on exceptions, the court was duty bound to consider plaintiff's last amended pleading in full on the hearing for summary judgment; Andrews v. Austin Motor Truck Co., Tex.Civ.App., 259 S.W.2d 772, 773, syl. 3; Meyer v. Wichita County Water Imp. Dists., Tex.Civ.App., 265 S.W.2d 660;—a required procedure in view of the litigant's right to amend his pleading upon sustaining of exceptions so as to present at the hearing a good cause of action, if one can be alleged. Jud v. City of San Antonio, 143 Tex. 303, 184 S.W.2d 821. It must be further noted here that the allegations of said second amended original petition are not in terms of negligence; in other words, that the burglary was due to any failure of defendant's equipment in matter of signals or of company employees to respond.

▇▇ Nor is reformation of contract sought in express terms; allegations to such effect appearing for the first time in his reply to aforesaid motion for a summary judgment. Nevertheless, we must as-

sume at this juncture that a case of reformation has been pled and we recognize the authority of Fitch v. Lomax, Tex.Com. App., 16 S.W.2d 530, syl. 3, 66 A.L.R. 758, holding: "It is not essential that reformation be had of a written instrument which does not represent the true contract by reason of fraud or mistake in order to permit a party to recover thereon." Appellant's unsworn reply to defendant's motion in question was largely a rehash of his named amended pleading; complaining of the court's error in sustaining of exceptions; reiterating his attack on the liquidated damage proviso of $50, in that same was an attempt to protect defendant against liability for its own negligence; and that the clause should be construed as a penalty only and likewise void.

 Rule 166–A is properly made use of for prompt disposition of cases found, upon the hearing, to raise no genuine issue of fact, with movant either as plaintiff or defendant. It has often been stated that all doubts as to the existence of a genuine issue of fact must be resolved against the party moving for a summary judgment; see Gulbenkian v. Penn, 151 Tex. 412, 252 S.W. 2d 929, and authorities cited; above statement being more generally referable to a defensive showing of no more than inferences or reasonable probability of a material issue, with plaintiff as movant. Bauman, Summary Judgment, 31 T.L.R., p. 876. But when the defendant moves for a summary judgment, the showing required of plaintiff may assume a somewhat different pattern; as illustrated by the following conclusions drawn from consistent Appellate decisions, both State and Federal: (1)

"* * * while there are decisions to the contrary, the better reasoned cases decide that mere pleadings do not show that there is a genuine issue of fact, and thus prevent summary judgment, but that the showing is to be made by depositions, admissions, affidavits, or like 'proofs,' one, some, or all. (Citing authorities). * * *." Stayton, University of Texas, 29 T.L.R., p. 688. (2) "Where a (defendant's) motion is supported by affidavits, depositions, admissions, or other extrinsic evidence, sufficient upon its face to establish facts which, if proven at the trial, would entitle the movant to an instructed verdict, the opponent must specify *opposing evidence* which will raise an issue as to some material fact, or must justify his failure to do so in accordance with the provisions * * *" of section (f), 166–A (where affidavits are unavailable). 30 T.L. R. 297; Sparkman v. McWhirter, Tex.Civ. App., 263 S.W.2d 832. (Emphasis ours.)

 As already seen, appellant-plaintiff filed no counter affidavit in support of his allegations of fraud and we must necessarily look to his own version of the facts; applying thereto the same test applicable to a motion for instructed verdict on part of defendant Company; treating as true all evidence favorable to Mr. Schepps, indulging in his favor all inferences that may reasonably be drawn therefrom, and resolving all doubts against the Service Company. Fowler v. Texas Emp. Ins. Ass'n, Tex.Civ. App., 237 S.W.2d 373 (writ ref.). Turning to the Schepps deposition narrative of facts leading up to his signing of the contract, we find no statements attributable to Agent Fisher amounting to actionable fraud and have been cited to none (See Footnote 1).

1. Of his fifty points assigning error, only No. 43 relates to such matters and this only generally. It reads: "The proof was undisputed that the appellant had only attended school for two weeks. That he relied upon the representations of the appellee as to the terms and conditions of said written instrument. That he was caused to believe that it did contain the terms agreed upon, and that the appellee, through fraud, omitted a portion of the actual contract, but the appellant was led to believe by the fraud of the appellee that the written instrument correctly contained all the terms of the contract actually agreed upon. That by reason of the fraud of the appellee the appellant was, thereby, entitled to recover and was (not) required by law to read said instrument; that there was nothing said or done by the appellee to cause him to believe the instrument did not contain the terms of the actual contract. He was not bound by said written contract and he had the right to have same reformed in accordance with

Indeed, an oral contract of indemnity as alleged is not touched upon in plaintiff's testimony, even by inference; or, for that matter, of his being without knowledge of any contract recital relative to limitation of liability, and that its insertion in the contract under the circumstances was a fraud upon him. Appellant need only to have filed a counter affidavit concerning said false representations, if any, and his reliance thereon, but this he did not see fit to do.

 In the situation thus presented, the trial court had no alternative other than to render a defendant's judgment; just as it would have been his duty to render an instructed verdict upon exactly the same showing. In the following appeals, defendant as the moving party, was given a summary judgment on basis of the plaintiff's sworn testimony, where this evidence failed to establish a prima facie case. Fowler v. Texas Emp. Ins. Ass'n, Tex.Civ.App., 237 S.W.2d 373, 374, syl. 4 (writ ref.) holds: "Generally, testimony of interested witness, such as party to suit, does no more than raise fact issue for jury, though uncontradicted, but such a witness' clear, direct and positive testimony, not contradicted by any other witness or attendant circumstances, is taken as true as matter of law." And in Zamora v. Thompson, Tex. Civ.App., 250 S.W.2d 626, 627, syl. 6 (writ ref.), that: "A party is not always bound by his own testimony, but when he testifies understandingly about matters within his own special knowledge he should be bound."

 In various points, appellant charges invalidity, as a matter of law, of paragraph 13, written contract, limiting liability to $50, "in case of the failure of the Contractor to perform any of its obligations hereunder; * * * and a resulting loss to the Subscriber * * *." Like contractual provisions have been recognized in Texas, turning uniformly on the facts and circumstances of the particular case. "Whether a sum named in a contract, to be paid to a party in default on its breach, is to be considered as 'liquidated damages' or merely

as 'penalty', depends in each case upon the peculiarities of the contract and particular facts." Zucht v. Stewart Title Guaranty Co., Tex.Civ.App., 207 S.W.2d 414, 415, syl. 6. "Generally, the question of whether a sum named in a contract be paid by a party in default on its breach is to be considered as liquidated damages, or merely as a penalty, is one of law for the court and is to be determined as of the time when the contract was executed." Id., syl. 7. "The viewpoint of the parties at the time when the contract was made, and not the situation which is shown to have existed when it was breached, is to be considered in determining the issue as to reasonableness of the stipulation or certainty as to actual damages." 13 Tex.Jur., p. 132, sec. 52. All courts agree, says our Supreme Court in Stewart v. Basey, 150 Tex. 666, 245 S.W. 2d 484, 486, "that to be enforceable as liquidated damages the damages must be uncertain and the stipulation must be reasonable."

 The same contractual provision has been upheld in actions involving alleged negligence of defendant Company (failure to transmit burglar alarm signals) in the following jurisdictions: American District Telegraph Co. of Alabama v. Roberts & Son, 219 Ala. 595, 122 So. 837, 840; Better Food Markets, Inc., v. American Dist. Tel. Co., 40 Cal.2d 179, 253 P.2d 10, 42 A.L.R.2d 580; the Alabama Court stating inter alia: "When the contract in question was entered into, the nature and amount of damages that might arise as the result of a breach were conjectural and uncertain, and the parties had the right to fix the same by the contract, and, having intended to do so, the court is not authorized to nullify this provision by declaring it a penalty, although the actual damage sustained may be in excess of the sum fixed by the contract." Likewise, the identical provision for liquidated damages was declared enforceable by the California Supreme Court on grounds well paraphrased by appellee as applicable to the instant case, viz.: "Clearly, it was permissi-

---

the actual contract and recover thereon. The court erred in refusing to render

judgment for him for his actual loss and damages."

ble for the parties, in a situation where a given burglary might result from the theft of one package of cigarettes, one case of coffee, or $40,000 worth of cigarettes to 4,000 cases of coffee, or an amount of money ranging all the way from a few dollars to several thousands to agree in advance that the damages resulting from the failure of the service being furnished by the defendant under a simple naked service policy would be limited to $50 for each breach. Whereas, the plaintiff may have suffered substantially in the burglary that did occur, nobody can say in the premises how many burglaries did not occur by reason of the fact that the defendant's burglar alarm services were in operation at his place of business. In other words, the amount saved by the plaintiff in this cause might be far more than the amount which happened to be lost. The point is that the defendant was obligated solely for sale of his services and the parties were certainly in a position to agree in advance what the agreed allocation of risks as between themselves might be with respect to failure of those services."

All points of error are accordingly overruled and judgment of the trial court is affirmed.

CRAMER, J., not sitting.